UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Juan Alvarado,

           Plaintiff,

v.

Isaiah Moore; Matthew McNeely; Joseph LeFevere; Matthew Blomsness; Joseph Huettl; Thomas Martinez; *each in their individual capacity as an officer of the St. Louis Park Police Department* and The City of St. Louis Park,

           Defendants.

Civil No. 24-288 (DWF/DTS)

MEMORANDUM
OPINION AND ORDER

## INTRODUCTION

This matter is before the Court on Defendants Isaiah Moore, Matthew McNeely, Joseph LeFevere, Matthew Blomsness, Joseph Huettl, Thomas Martinez, (collectively, "Defendant officers") and the City of St. Louis Park's ("the City") motion to dismiss Plaintiff Juan Alvarado's complaint. (Doc. No. 6.) Plaintiff opposes the motion. (Doc. No. 13.) For the reasons set forth below, the Court grants the motion.

## BACKGROUND

On April 16, 2023 around 5:50 p.m., Alvarado parked his car in the parking lot outside of the Goodwill store in St. Louis Park, Minnesota ("Goodwill"). (Doc. No. 1 ("Compl.") ¶ 6.) He was driving a gray 2012 Jeep Patriot with Minnesota license plate number FLN792. (*Id.*) Around that same time, dispatch for the St. Louis Park Police Department alerted the Defendant officers to a carjacking at gunpoint that had taken

place in the area. (*Id.* ¶ 7.) The car involved was a green 2015 Jeep Patriot with Minnesota license plate number FBG547. (*Id.*) The suspects were three Black juvenile males wearing masks. (*Id.*) Based on the tracking information on the victim's phone, dispatch told the Defendant officers that the car was parked in Goodwill's parking lot. (*See* Doc. No. 10, Ex. 1 ("Moore Squad Video") at 22:52:44–22:54:37; Doc. No. 10, Ex. 6 ("Huettl BWC") at 23:08–23:09.) The Defendant officers proceeded to Goodwill in various squad cars. (*See* Moore Squad Video; Doc. No. 10, Ex. 2 ("Huettl Squad Video"); Doc. No. 10, Ex. 3 ("LeFevere Squad Video"); Doc. No. 10, Ex. 9 ("Martinez BWC").) At 5:56 p.m., Officers McNeely and Moore saw Alvarado's car which appeared to match the vehicle and location description given by dispatch. (Moore Squad Video at 22:56:56.) At the time, the sky was cloudy and gray with some light snow and rain. (*See id.* at 22:55–23:09.)

    The officers pulled their cars back from view while they strategized how to approach the car, believing that it may contain the three armed carjackers. (*Id.* at 22:57–23:05; Huettl Squad Video at 22:57–23:03.) The officers also discussed the possibility of crossfire. (Moore Squad Video at 23:04; Huettl Squad Video at 23:00–04.) At 6:03 p.m., Officer Huettl announced the plan to the nearby officers. (Huettl Squad Video at 23:03.) At 6:05 p.m., Huettl gave the "initiate" order to all officers. (*Id.* at 23:05:10.) As the Defendant officers began to drive toward Alvarado's car, he suddenly put the car in reverse. (*Id.* at 23:05:23; Moore Squad Video at 23:05:23.) The officers immediately sped up toward Alvarado's car to pin it in. (Moore Squad Video at 23:05:24–23:05:35.) First, McNeely hit the driver side of Alvarado's car with Moore's squad car, slowing

down before hitting it. (*Id.* at 23:05:31.) Then, Huettl hit the back of Alvarado's car with his squad car, also slowing down before hitting it. (Huettl Squad Video at 23:05:32.) And finally, Officer LeFevere drove up close to Alvarado's passenger side door and parked his squad car. (LeFevere Squad Video at 23:03:35.) Officer Martinez parked his squad car in a nearby parking lot, just in front of Alvarado's car. (Martinez BWC at 23:03:36–40.)

McNeely and Moore got out of their squad car with their guns drawn and repeatedly told Alvarado to put his hands up. (Moore Squad Video at 23:05:32–58; Doc. No. 10, Ex. 4 ("McNeely BWC") at 23:05:32–58; Doc. No. 10, Ex. 5 ("Moore BWC") at 23:05:32–58.) LeFevere, Huettl, Martinez, and Sergeant Blomsness also exited their cars, drawing their guns. (Huettl BWC at 23:05:36–37; Martinez BWC at 23:05:47; Doc. No. 10, Ex. 7 ("Blomsness BWC") at 23:05:36–40.) At the same time, Huettl noticed that Alvarado did not meet the description of the suspects, saying to the others "there's an old guy in it. There's an old white guy in it." (Huettl BWC at 23:05:36–40.) Similarly, LeFevere got out of his squad car on the passenger side and remarked to the officers on that side "plate does not match" and "description does not match." (Doc. No. 10, Ex. 8 ("LeFevere BWC") at 23:05:49.) At 6:06 p.m., Huettl holstered his gun and got in his squad car to run the plates on Alvarado's car. (Huettl BWC at 23:05:55–23:06:27.) He then told Blomsness and the other officers "that's not the right car" and "negative on the car." (*Id.* at 23:06:18–27.) A few seconds later, Blomsness holstered his gun and walked around Huettl's squad car to the back of Alvarado's car and told the other officers: "Slow it down, boys. Slow it down." (Blomsness BWC at 23:06:21–38.) Around five

seconds later, both Moore and McNeely holstered their guns. (Moore BWC at 23:06:44; McNeely BWC at 23:06:46.)

McNeely moved back Moore's squad car, clearing the space next to the driver side door of Alvarado's car. (Moore Squad Video at 23:06:52.) LeFevere approached Alvarado's door, holstering his gun before going to open it. (*Id.* at 23:07:08.) Martinez stayed on the passenger side of Alvarado's car with his gun out but did not point it at Alvarado. (Martinez BWC at 23:06:13–23:07:07.) He holstered his gun as LeFevere approached the driver's side door. (*Id.* at 23:07:07–10.) LeFevere guided Alvarado out of the car and had him place his hands on top of his head momentarily. (Moore Squad Video at 23:07:10–30.) Shortly after, Moore approached to assist LeFevere with the arrest. (*Id.*) After Moore approached Alvarado and LeFevere, McNeely told LeFevere and Moore to move Alvarado back as he approached Alvarado's car, drawing his gun out and pointing it at the car to search the back seat. (*Id.* at 23:07:28–34; Moore Squad Video 23:07: 27–34.) Approximately ten seconds later, McNeely holstered his gun again. (McNeely BWC at 23:07:38; Moore Squad Video at 23:07:38.)

As McNeely approached Alvarado's car, Officer Huettl got out of his squad car to confirm that the VIN on Alvarado's car matched the one in the system, thus confirming that the plates were not stolen. (Huettl BWC at 23:07:20–44.) Meanwhile, Moore and LeFevere handcuffed Alvarado just behind the car. (Moore BWC at 23:07:37.) Approximately seven seconds later, Huettl told the other officers that the plates were not stolen and Alvarado's car was not the stolen vehicle. (*Id.* at 23:07:44.) Two seconds later, Blomsness told Moore and LeFevere to "take him out of the cuffs." (Blomsness

4

BWC at 23:07:46.)  Moore and LeFevere immediately took the cuffs off Alvarado. (Moore BWC at 23:07:47.)  Alvarado was in handcuffs for approximately ten seconds. Immediately after uncuffing Alvarado, Blomsness apologized and explained why they performed the stop and arrest in the manner that they did.  (Blomsness BWC at 23:08.) After the incident, Alvarado was treated for a minor shoulder injury and a trauma-related disorder.  (Doc. No. 14, Ex. F.)

Alvarado now brings this action against the Defendant officers and the City. Alvarado brings an excessive force claim against the Defendant officers and a failure to train and *Monell* liability claim against the City.

## DISCUSSION

### I.    Legal Standard

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant.  *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).  In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative

level." *Id.* at 555. As the United States Supreme Court reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6). *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). "Videos of an incident are necessarily embraced by the pleadings," so they may be considered in deciding a motion to dismiss. *Ching v. City of Minneapolis*, 73 F.4th 617, 621 (8th Cir. 2023). Additionally, a court need not "adopt the plaintiff's version of facts if they are 'blatantly contradict[ed]' by video evidence." *Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019) (alteration in original) (quoting *Boude v. City of Raymore*, 855 F.3d 930, 933 (8th Cir. 2017)). However, "[i]nconclusive video evidence must be construed in the plaintiff's favor." *Abdullah v. Lepinski*, No. 23-cv-121 (ECT/DTS), 2023 WL 5515895, at *2 (D. Minn. Aug. 25, 2023); *cf. Raines v. Counseling Assocs., Inc.*, 883 F.3d 1071, 1075 (8th Cir. 2018); *Thompson v. City of Monticello*, 894 F.3d 993, 998–99 (8th Cir. 2018).[1]

---

[1] Defendants submitted body camera videos from seven officers and squad car videos from five squad cars. (Doc. No. 10.) The Court has reviewed all of these video submissions.

6

**II.     Qualified Immunity**

The doctrine of qualified immunity protects state actors from civil liability when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The defense provides "ample room for mistaken judgments" as it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986).

To overcome the defense of qualified immunity, a plaintiff must show that:  (1) the facts "demonstrate the deprivation of a constitutional or statutory right"; and (2) "the right was clearly established at the time of the deprivation." *Handt v. Lynch* 681 F.3d 939, 943 (8th Cir. 2012).  The Court has discretion to decide which qualified immunity prong to consider first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Alvarado alleges that the Defendant officers violated the Fourth Amendment's protection against unreasonable searches and seizures.  More specifically, Alvarado alleges that the officers used excessive force in their seizure of him on April 16, 2023.  To determine whether the use of force was excessive, a court must determine whether the officer's conduct was objectively reasonable. *Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011).  To do so, a court examines the facts and circumstances of the particular case, including the three *Graham* factors:  (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also Kingsley v. Hendrickson*,

7

576 U.S. 389, 397 (2015) ("Considerations such as the following may bear on the reasonableness or unreasonableness of the force used; the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.").

Alvarado alleges three instances of excessive force on April 16, 2023: (1) the officers hitting his car; (2) the officers putting his hands above his head, walking him backward, and handcuffing him; and (3) the officers pointing their guns at him. The Court analyzes each in turn for possible excessive force in violation of the Fourth Amendment.

### A.   Officers McNeely and Huettl Hitting Alvarado's Car

First, Alvarado alleges that the officers hitting his car is excessive force under the Fourth Amendment. At the time that McNeely and Huettl hit Alvarado's car they believed that it may have contained three armed carjackers. Carjacking at gunpoint is a severe crime because of the involvement of firearms. The involvement of firearms also increases the likelihood of immediate danger being posed to the officers or others in the area. Indeed, the officers discussed the possibility of crossfire with each other before making a move on the car. Additionally, as the officers began their approach, Alvarado switched the car into reverse. While he was not the fleeing carjackers and may not have even noticed the officers, a reasonable officer could think that the suspect was attempting

to flee the scene. Lastly, it is notable that the officers did not hit Alvarado's car with much force. Both McNeely and Huettl slowed down just as they approached the car.

In sum, the facts and circumstances surrounding McNeely and Huettl hitting Alvarado's car support that the amount of force used was reasonable and not excessive. Thus, there is no violation of the Fourth Amendment on this point.

**B.     Alvarado's Arrest**

Second, Alvarado alleges that his arrest and the surrounding conduct is excessive force under the Fourth Amendment. Police officers have the right to use some physical force when effectuating a lawful seizure or arrest. *Johnson v. Carroll*, 658 F.3d 819, 825 (8th Cir. 2011). Moreover, the Eighth Circuit has expressed that some use of force is inevitable in the handcuffing of a suspect. *Chambers*, 641 F.3d at 907. "For the application of handcuffs to amount to excessive force, there must be something beyond minor injuries." *Hanig v. Lee*, 415 F.3d 822, 824 (8th Cir. 2005). A de minimis use of force cannot be the basis for a Fourth Amendment claim. *Setchfield v. St. Charles County*, 109 F.4th 1084, 1092 n.3 (8th Cir. 2024); *see also Waters*, 921 F.3d at 739–40 (citing cases that illustrate the meaning of de minimis force).

Here, the force used by the Defendant officers in the apprehension and arrest of Alvarado was minor and could be considered de minimis. First, LeFevere asked Alvarado to get out of the car and LeFevere assisted him out of the car without his gun or other force. At that point, LeFevere briefly had Alvarado place his hands on top of his head. Next, LeFevere and Moore guided Alvarado backwards a few feet to the rear of the car as McNeely asked them to move backward. Then, LeFevere and Moore secured

9

Alvarado's hands behind his back with handcuffs, which lasted for approximately ten seconds. None of these actions required much touching or application of force to Alvarado. None of these actions during the arrest sequence were objectively unreasonable. Alvarado does not contend that the Defendant officers lacked the authority to make an arrest at that time. Any of the force they used on him was part of effecting that lawful arrest and did not go beyond the force necessary to effectuate the arrest. In conclusion, the arrest conduct does not violate the Fourth Amendment.

### C.   Pointing Guns at Alvarado

Lastly, Alvarado alleges that the Defendant officers' continued brandishing and pointing of guns constitutes excessive force. Like all other uses of force under the Fourth Amendment, whether pointing a gun at an individual constitutes excessive force depends on the facts and circumstances of the case. *See Wilson v. Lamp*, 901 F.3d 981, 990 (8th Cir. 2018). While a police officer may brandish their weapon when presented with a serious danger, an officer cannot continue to point a gun at an individual after the circumstances making such use of force reasonable have changed. *Williams v. Decker*, 767 F.3d 734, 740 (8th Cir. 2014); *see Wilson*, 901 F.3d at 990; *Neal v. Ficcadenti*, 895 F.3d 576, 581 (8th Cir. 2018) ("[A] reasonable officer is not permitted to ignore changing circumstances and information that emerges once arriving on scene.").

In *Wilson v. Lamp*, a man and his son sued police officers under § 1983 alleging excessive force among other claims. *Wilson*, 901 F.3d at 985. While the man and his son were driving one night, police officers pulled the man's car over, believing his brother was driving. *Id.* The brother was a convicted child molester and the police officers

believed he would be meeting a minor in a park later that evening. *Id.* The officers approached the vehicle with their guns drawn. *Id.* One of the officers immediately recognized the man as the convicted child molester's brother, even calling him by his name. *Id.* Despite this, the officers pulled the man and his son from the vehicle, threw the man against the vehicle, and searched him and the vehicle. *Id.* The man and his son had at least one weapon pointed at them during the entire encounter. *Id.* The Eighth Circuit found that while the officers' initial use of weapons was reasonable, the continuation after they discovered the identity of the man and his son and conducted a patdown search was unreasonable and thus constituted excessive force. *Id.* at 990.

This case differs from *Wilson* because the pointing of weapons at Alvarado ceased before the officers confirmed that he was not driving the stolen vehicle, and therefore that he was not involved in the carjacking. McNeely, Moore, Huettl, Blomsness, LeFevere, and Martinez brandished their guns as they exited their squad cars. The initial pointing of their guns was warranted because they reasonably believed they were approaching a car that contained three armed carjackers. Alvarado's car was the same make and model, appeared to be the same color on the cloudy day, and, following the tracking data on the victim's phone, was in the same location as the stolen car, the Goodwill parking lot.

After their first approach, the officers quickly decreased their use of force. Huettl quickly holstered his gun, looked up Alvarado's plate, and discovered that it did not match the stolen car, which prompted Blomsness to tell the other officers to slow down. Immediately after this, McNeely and Moore holstered their weapons. LeFevere and Martinez holstered their weapons about thirty seconds later and before Alvarado got out

11

of the car. McNeely did draw his weapon again after moving Moore's squad car back and approaching Alvarado's car but pointed it at the car while looking in the back seat. At that point, the officers had figured out that the plates did not match the plate number of the stolen vehicle, but they had not determined whether Alvarado's car had stolen plates on it. McNeely holstered his gun again before Huettl verified the VIN on Alvarado's car and confirmed that Alvarado's car was not the stolen vehicle. The last gun pointed at Alvarado was LeFevere's gun, but he holstered it after about a minute-and-a-half had passed and Huettl had not yet confirmed that the plates were not stolen.

The officers had clues indicating that Alvarado's car was not the stolen vehicle, but it was not definitively confirmed until Huettl checked the VIN. Although the plates did not match, it was still possible that the car had stolen plates. Although Alvarado did not match the description of the suspects, the police did not know if the other three males had gone inside the Goodwill or one of the other nearby stores. Although his Jeep was gray and the stolen Jeep was green, the color was not entirely clear on the cloudy, snowy day. Even so, as the officers got additional clues that Alvarado's car was not the stolen car, they began to use less force and holster their weapons. The officers reacted to the information they were getting in real time and continuously evaluated the level of force they were using.

In sum, the pointing of weapons was warranted when the Defendant officers first stopped Alvarado's car, but that amount of force became less reasonable as they discovered more circumstances that explained that Alvarado and his car were not

connected to the carjacking.  The officers reacted reasonably to the changing circumstances, so this was not excessive force under the Fourth Amendment.

Because there is no deprivation of a constitutional or statutory right in this case, the officers are entitled to qualified immunity.  As the defendants are entitled to qualified immunity, Count One of the complaint must be dismissed with prejudice.  *Trendle v. Campbell*, 465 Fed. App'x 584, 585 (8th Cir. 2012); *Moore ex rel. Moore v. Briggs*, 381 F.3d 771, 775 (8th Cir. 2004).

### III.     Failure to Train and Supervise, and *Monell* Liability

Alvarado has also alleged that the City of St. Louis Park "failed to supervise, instruct, and train" and maintained "a custom, pattern and practice" of performing unreasonable seizures and using excessive force.  (Compl. ¶¶ 26–27.)  First, because the officers are entitled to qualified immunity on Count One, the City cannot be liable on a failure to train claim.  *Roberts v. City of Omaha*, 723 F.3d 966, 976 (8th Cir. 2013) ("Our decision granting qualified immunity to the individual officers necessarily forecloses liability against the municipality on Roberts's failure to train claims as well."); *see also Johnson v. City of Ferguson*, 926 F.3d 504, 506–07 (8th Cir. 2019) (en banc) ("In light of our holding that no seizure and thus no constitutional violation occurred in this case, Johnson's claim of supervisory liability against Chief Jackson necessarily fails, as perforce does any claim of municipal liability against the City of Ferguson.").

Second, Alvarado's custom, pattern, and practice *Monell* claim fails because a *Monell* claim cannot survive without an underlying violation of a plaintiff's constitutional rights.  The Eighth Circuit has explained "that although 'there must be an

13

unconstitutional act by a municipal employee' before a municipality can be held liable, there 'need not be a finding that a municipal employee is liable in his or her individual capacity.'" *Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018) (citation omitted) (first quoting *Russell v. Hennepin County*, 420 F.3d 841, 846 (8th Cir. 2005); and then quoting *Moyle v. Anderson*, 571 F.3d 814, 818 (8th Cir. 2009)). Essentially, a municipality can still be found liable after a court grants qualified immunity to an employee in their individual capacity, but a municipality cannot be liable if there is no underlying constitutional violation. This Court granted qualified immunity based on a finding that the officers did not violate Alvarado's constitutional rights, i.e. use excessive force. There are no other violations of Alvarado's constitutional rights that the *Monell* claim could attach to in this case, so the claim must be dismissed.

## CONCLUSION

For the reasons set forth above, the Court dismisses Plaintiffs' claims with prejudice.[2]

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

---

[2] The chances of an individual in a similar car being parked in the exact location as a recently stolen vehicle are incredibly slim. While the Court dismisses Alvarado's claims today by granting qualified immunity, it recognizes Alvarado's struggles with a trauma-related disorder since April 16, 2023. (Doc. No. 14, Ex. F.) The Court hopes the parties can continue to work together outside of this case and any possible appeals. The Court believes the best interests of the parties would be served with a resolution of this case.

1. Defendants' motion to dismiss (Doc. No. [6]) is **GRANTED**.

2. Plaintiffs' claims against Defendants (Doc. No. [1]) are **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated:  September 30, 2024          s/Donovan W. Frank
                                                  DONOVAN W. FRANK
                                                  United States District Judge